[Cite as *Harmon v. Harmon*, 2017-Ohio-8682.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY

| | | |
|---|---|---|
| KEVIN S. HARMON, | : | |
| Plaintiff-Appellee, | : | CASE NO. CA2017-04-047 |
| | : | O P I N I O N |
| - vs - | | 11/27/2017 |
| | : | |
| DEEANN RADCLIFF f.k.a. HARMON, | : | |
| Defendant-Appellant. | : | |

APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
DOMESTIC RELATIONS DIVISION
Case No. DR 10060698

O'Connor, Mikita & Davidson, LLC, Michael J. O'Connor, 8035 Hosbrook Road, Suite 200, Cincinnati, Ohio 45236, for plaintiff-appellee

Harry B. Plotnick, 11069 Reading Road, #62567, Cincinnati, Ohio 45241, for defendant-appellant

**HENDRICKSON, P.J.**

{¶ 1} Defendant-appellant, DeeAnn Radcliff f.k.a. DeeAnn Harmon ("Mother"), appeals from a decision of the Butler County Court of Common Pleas, Domestic Relations Division, terminating a shared parenting agreement and naming plaintiff-appellee, Kevin S. Harmon ("Father"), the residential parent and legal custodian of the parties' two daughters.

Mother also appeals the trial court's decision to award Father child support and both tax dependency exemptions. For the reasons set forth below, we affirm in part, reverse in part, and remand the matter for further proceedings.

{¶ 2} Mother and Father are the parents of P.H., born on January 31, 2004, and M.H., born on June 22, 2005. The parties were once married, but divorced in January 2011. At the time of their divorce, the parties entered a shared parenting plan, which provided that "each [p]arent shall be deemed the residential [p]arent." The shared parenting plan provided the following with respect to the parenting time of the parties:

> Father's parenting time with the Child [sic] is alternating weekends from Friday at 6:00 p.m. until Sunday at 6:00 p.m., and every Monday and Thursday from 4:45 p.m. until 9:00 p.m. Parents may always vary these times and days by agreement. Parents are responsible for providing alternate care and supervision during his or her respective parenting times. Mother has a right to spend all other times with the Child [sic] not specifically allocated otherwise in the * * * holiday and vacation plan.

The terms of the shared parenting plan required Father to pay child support and awarded him both tax dependency exemptions beginning with the 2010 tax-year. However, the shared parenting plan specified that "Mother shall be entitled to claim the child [M.H.] as a dependent for tax purposes in all years, beginning with the tax year of 2011 if she is gainfully employed and receives any tax benefit for the tax dependency exemption or the qualifying tax credit."

{¶ 3} After agreeing to change Father's parenting time from Monday and Thursday evenings to Monday and Wednesday evenings, the parties abided by the terms of the shared parenting agreement for a number of years. Then, on December 28, 2015, Mother filed a motion to terminate the shared parenting plan and to be named the residential parent and

legal custodian of the children.[1] In her motion, Mother argued that Father (1) did not participate in the children's educational needs or attend their parent-teacher conferences, (2) interfered with orthodontic treatment for the children, (3) refused to accept M.H.'s ADHD diagnosis and prevented her medications from being filled at pharmacies, and (4) waited to pick-up an antibiotic for one of the children for three days even though he was advised the child was sick and the prescription was available. Father was opposed to shared parenting being terminated, but nonetheless argued that he should be named the residential parent and legal custodian. The trial court appointed a guardian ad litem ("GAL") and set the matter for a hearing.

{¶ 4} While Mother's motion was pending, the Butler County Child Support Enforcement Agency ("CSEA") conducted an administrative adjustment review of Father's child support obligation. CSEA recommended that Father's monthly child support obligation be reduced from $565.27 to $435.16, when private medical insurance was provided for the children.[2] Both Mother and Father requested an administrative adjustment hearing based on CSEA's recommendation. Father asked that his child support obligation be recalculated to reflect the fact both he and Mother were the residential parents and had the children "50/50." Mother asked for a recalculation of Father's support obligation on the basis that CSEA relied on incorrect income information and Father was "voluntarily underemployed."

{¶ 5} A hearing on Mother's motion to terminate shared parenting as well as CSEA's administrative adjustment was held on August 23, 2016. At this hearing, numerous exhibits including tax information for the parties, medical and orthodontia records for the children,

---

1. During the course of proceedings on Mother's motion to terminate shared parenting, the magistrate dismissed Mother's motion without prejudice due to the time limitations set forth in Sup.R. 40. In doing so, the magistrate held that "[a]ll proceedings [on the motion to terminate] will survive this dismissal and can and will be used by the Magistrate in rendering her decision on said motions." Mother refiled her motion on September 2, 2016.

2. Medical insurance is provided for A.H. and M.H. through Father's current spouse at no cost to Father.

emails exchanged between the parties regarding scheduling needs and various medical appointments for the children, text messages exchanged between Mother and M.H. regarding an orthodontia problem M.H. experienced while in Father's care, and evaluations conducted by M.H.'s school and by the Cincinnati Children's Center for ADHD regarding M.H.'s ADHD diagnosis were accepted into evidence. Also accepted into evidence were two GAL reports, dated May 13, 2016 and June 21, 2016, respectively. The May 13, 2016 GAL report recommended that the parties continue to exercise shared parenting of the children, Mother include Father in all major decisions regarding the children, and Father take steps to ensure he is involved in the children's medical and educational needs. The GAL also recommended minor adjustments be made to Father's parenting time under the shared parenting plan, suggesting that the children be dropped off at Mother's home at 8:00 p.m. on Monday and Wednesday evenings during the school year and that the children have overnight visits with Father on Mondays and Wednesdays throughout the summer months. In his second report, dated June 21, 2016, the GAL stated that if the parties were committed to terminating shared parenting, he recommended Father be named the residential parent of P.H. and M.H. However, the GAL kept his previous parenting time recommendation, stating that his parenting time recommendation "[did] not change simply because the title of shared parenting change[d] to custody."

{¶ 6} Mother, Father, and the GAL testified at the August 23, 2016 hearing. Mother testified she lives in Cincinnati with her fiancé, M.H., and P.H. She manages a trust for her late father, which provides her with a yearly income of $65,000 and a flexible work schedule.

{¶ 7} Mother testified she sought to be named residential parent of the children due to concerns with Father's methods of discipline and his lack of involvement and, at times, interference in the children's medical and educational needs. Regarding the children's education, Mother presented testimony that Father did not always complete homework with

- 4 -

the children when they were in his care, did not attend parent-teacher conferences, and did not access the children's school's online portal to view their grades, homework assignments, or upcoming tests. Mother explained that when M.H. was in second grade, her pediatrician diagnosed her with ADHD and recommended M.H. take a prescription to treat the disorder. Father disagreed with the diagnosis and treatment plan, even after M.H.'s school psychologist provided a second opinion concurring with the diagnosis. Father finally accepted M.H.'s ADHD diagnosis after receiving a third evaluation by Cincinnati Children's Center for ADHD. However, according to Mother, Father has not always abided by M.H.'s treatment plan and he has failed to consistently dispense M.H.'s ADHD medication.

{¶ 8} Mother also testified that Father does not attend the children's medical appointments, even though he is given advance notice of the appointments. To Mother's knowledge, Father does not routinely contact the children's therapists or doctors to follow up on appointments or treatments. Mother explained Father once interfered with her ability to fill prescriptions for the children by contacting various pharmacies in the West Chester area and telling them to only fill the prescriptions at Father's request. Father also interfered with the children's ability to obtain orthodontal care. Mother explained that M.H. and P.H. needed braces and, after obtaining a second opinion at Father's request, treatment was started. However, treatment was stopped, and certain orthodontic appliances removed from M.H.'s mouth, after Father threatened to sue the orthodontist if treatment was continued. Eventually the children were able to obtain the orthodontal care they required after Mother agreed to pay for all services.

{¶ 9} After the orthodontia care was restarted, M.H. broke the holding arch in her mouth during Father's weekend parenting time. M.H. texted Mother that her mouth "really hurt" and that she told Father about it but that he "kinda blamed it on me insted [sic] of helping me." Mother ended up calling the orthodontist to get an emergency appointment,

picking M.H. up from Father's house on Sunday morning to take M.H. to the appointment, and then returning M.H. to Father's home after the appointment.

{¶ 10} On another occasion, M.H. hurt her foot while in Father's care. Father did not take M.H. to the doctor during his parenting time. Instead, after school the following day, Mother took M.H. to the doctor. M.H. had injured her growth plate and was required to wear an air-cast boot for a few weeks.

{¶ 11} Mother testified about the problems she and Father have in disciplining the children. Mother explained that Father views her as more of a disciplinarian when it comes to M.H., and he often does not agree or support the punishments Mother imposes. For instance, when M.H. mistakenly sent a disparaging text message riddled with curse words and devil emojis to Mother, rather than to an intended classmate, Mother took away the iPod M.H. used to send the message. Mother testified Father disagreed with punishment and wanted to give the iPod back to the child.

{¶ 12} Mother also explained that the parties have a difficult time communicating with one another, as Father refuses to interact with Mother over the phone. Father will only communicate with Mother through text messages or emails, which Mother finds inefficient and, at times, ineffective.

{¶ 13} Father testified that he lives in Montgomery with his current wife ("Stepmother"), his mother-in-law ("Step-grandmother"), his three teenage stepchildren, and M.H. and P.H. Father works as a sales representative, earning $36,000 a year. Father's job does not afford him flexibility and requires him to work Monday through Friday, from 8:00 a.m. until 5:00 p.m. or 5:30 p.m. Due to his work requirements, Father is unable to attend medical appointments and parent-teacher conferences for the children. However, Father explained, he has spoken over the phone with some of the children's medical providers and teachers to discuss their progress. For instance, Father explained, he spoke with M.H.'s

school psychologist and had input into the I.E.P. plan M.H. follows at school. Also, near the end of the previous school year, he signed up to access the school's online parent portal and was placed on the school's email list. Finally, Father testified that he does homework with the children when they are in his care.

{¶ 14} Father acknowledged that he has only taken the children to their medical appointments three or four times in the last two years. However, he claimed Mother did not timely inform him of many of the children's appointments and he often only learned about the children's medical issues after the appointment was held and a diagnosis was rendered. Although he is aware that Children's Hospital has an online portal that he can sign up for that would allow him to view the children's scheduled appointments and medical test results, he has not yet created an account to view this information.

{¶ 15} Regarding M.H.'s ADHD diagnosis and treatment, Father admitted that he did not accept the diagnosis until after Cincinnati Children's conducted an evaluation. He also admitted that he was initially unhappy with the treatment plan for M.H.'s ADHD. Father wanted to look at alternative measures to medication to treat M.H.'s ADHD and other issues the children were having, including P.H.'s anxiety and OCD issues. Father testified that he believes Mother over-medicates the children and that there are other ways of treating the children's issues. Father acknowledged, however, that the new medication and treatment plan M.H. is following for her ADHD has been effective and he is currently satisfied with it.

{¶ 16} Father denied interfering with Mother's ability to get prescriptions filled for the children. He explained he contacted the pharmacies to ask that they verify the identification of the individuals picking up prescriptions for the children to ensure that only he and Mother were obtaining the medication. He also denied that he failed to properly dispense M.H.'s prescription medication to her. Father explained M.H.'s medication was given to him in plastic baggies, rather than in the prescription bottles, and he would follow the instructions

Mother handwrote on the baggies in administering the medications.

{¶ 17} Father testified that he did not intentionally interfere with the children's ability to receive orthodontal care. Father denied asking for a second opinion regarding the children's need for treatment and claimed that he was not opposed to the children receiving orthodontal care, but he had concerns about his ability to afford the treatment. After learning in the beginning of November 2015 that treatment had begun, he informed the orthodontist of his inability to pay for the services and declined treatment for the children. Father testified he tried to work out an acceptable payment plan with both the orthodontist and Mother, but was unsuccessful in his attempts. Eventually, the children were able to obtain the required treatment, with Mother paying for all services.

{¶ 18} Father testified about the broken orthodontia appliances and foot injury M.H. sustained while in his care. With respect to the broken holding arch, Father testified that M.H. broke the arch because she "pried it with her finger." When M.H. told Father her mouth hurt after the arch broke, he told her "this is something you need to learn from, that you can't pick at devices because it irritates you * * * and * * * we're gonna have to address this with – Mom." He did not call the emergency phone number for the orthodontist because he was unaware that such a number existed. However, Father testified he coordinated with Mother to find out when M.H. could be seen by the orthodontist.

{¶ 19} As for the injury to M.H.'s foot, Father testified that M.H. injured herself when she ran into the back of P.H.'s foot while they were shopping. M.H. had sandals on at this time. Then, when leaving a store, M.H. accidentally hit her foot on the door frame. Later that evening M.H. dropped a baby gate on her foot and hit her foot against a coffee table. Father was aware M.H. was in some pain and she was limping a little bit, but M.H.'s foot was not swollen when Father dropped her off at Mother's home on Sunday evening. Father testified that he did not see M.H. on Monday, but was made aware that M.H.'s foot had been

"stomped on" by another student on the school bus and that Mother had sought medical attention for M.H. after this occurrence.

{¶ 20} With respect to the manner in which the parties discipline the children, Father agreed that he and Mother have different approaches. Regarding the inappropriate text message that caused Mother to take away M.H.'s iPod, Father stated he would have handled the situation differently as there were "other means that [he] could take on * * * that would teach [M.H.]" better behavior. He felt Mother taking away the iPod for multiple weeks was excessive.

{¶ 21} The GAL testified about his interactions with the parties and the children. Mother expressed to the GAL frustration and concern over Father's interference in getting the children orthodontal care. However, after speaking to Father, the GAL opined that he did not feel Father interfered with the children obtaining treatment "to the level that [Mother] thought he was interfering." The GAL noted Father had agreed treatment was necessary but Father had sought to stagger treatment due to financial reasons. The GAL also noted that from his interactions with Father, it was apparent that Father felt like "he was not a part of the initial part of the orthodontic care" plan.

{¶ 22} The GAL noted that Mother's failure to communicate was a common complaint of Father. With respect to M.H.'s ADHD diagnosis and treatment plan, Father did not feel like he was "involved with the providers that recommended the medication. Therefore, he felt uncomfortable giving the medication because he wasn't completely sure why [M.H. was] taking it." The GAL testified Mother admitted to him that she would sometimes make appointments for the children without telling Father because she was worried he would cancel the appointments. This led the GAL to recommending that Father, "given [his] concern about medication/therapy currently being taken by [P.H.] and [M.H.], * * * go above and beyond" to become involved with such decisions. He also recommended that Mother

"stop intentionally not informing [Father]."

{¶ 23} Finally, with respect to the parties' different approaches to disciplining the children, the GAL testified that he would like for the parties to make more of an effort to "be on the same page between households if possible." He commented that it would be ideal if punishments were carried over from one household to the other.

{¶ 24} During the course of the GAL's testimony, it became apparent that he filed his reports and made his recommendation that Father be named the residential parent without being informed by the parties of the injury M.H. sustained to her foot or the orthodontia problem she had with her holding arch. The magistrate continued the hearing to October 21, 2016, to provide the GAL time to investigate these events and to file a supplemental report and recommendation regarding custody.

{¶ 25} While the GAL was looking into these matters, an issue arose regarding the children's attendance at Mother's wedding, which was scheduled to occur on a weekend when Father had parenting time. Father initially agreed to allow the children to attend Mother's wedding and offered to care for the children during Mother's honeymoon provided that Mother give him the name and contact information of her fiancé and her fiancé's adult son. Mother gave Father her fiancé's full name and contact information and her fiancé's son's name, age, and place of work. She did not give Father her fiancé's son's phone number or address, as the son did not live with the fiancé and Mother. Father responded to this information by email, stating:

> Since you have left [the son] in charge of both [P.H.] and [M.H.] multiple times while you travel on your weekends, I will await [the son's] contact information. Once I receive [the son's] contact telephone number, then I will honor exactly 1 week for your honeymoon. If you plan to take longer than 1 week you will need to make arrangements for the additional time.

After the parties reached an impasse and Father refused to permit the children to attend the

wedding, Mother filed a motion for an emergency hearing to get an order permitting the children to attend her wedding.

{¶ 26} Following this hearing, the magistrate issued a decision granting Mother's request to modify parenting time so that the children could attend her wedding. The magistrate's decision provided that the children would remain with Mother from Friday, September 16, 2016, until 10:00 a.m. on Sunday, September 18, 2016. At that point, the children were to remain in Father's custody for the remainder of the week, while Mother was on her honeymoon. Mother filed objections to the magistrate's decision, arguing that the magistrate's decision "is not in the best interests of the minor children and is contrary to law." The objection hearing was not scheduled until October 26, 2016 – well after Mother's wedding and honeymoon were over.

{¶ 27} The children attended Mother's wedding, but were not permitted to spend the week in Father's care. Instead, Mother hired a nanny to stay with the children at her house for a few days and then allowed the children to stay with their maternal grandmother and a family friend for the remainder of the week. However, Father was provided with his Monday and Wednesday evening parenting time during this week. Once Mother's honeymoon was over, she withdrew her objection to the magistrate's decision and the October 26, 2016 objection hearing was vacated.

{¶ 28} Thereafter, on October 21, 2016, the hearing on Mother's motion to terminate shared parenting and on the CSEA's administrative adjustment reconvened. At the hearing, the parties and the magistrate acknowledged they had all received the GAL's supplemental report, dated October 12, 2016, which addressed M.H.'s foot injury and orthodontia problem, as well as the issues relating to Mother's wedding. Although this report was not admitted into

evidence, the GAL did testify about these events at the hearing.[3]

**{¶ 29}** With respect to the parties' behavior regarding the children's attendance at Mother's wedding, the GAL noted the parties had engaged in "gamesmanship." The GAL stated he did not like Father's "tone or the language he used" when communicating with Mother and he was displeased with Father's passive-aggressive email exchanges. The GAL was likewise displeased with Mother's decision to object to Father having custody of the children during the week of Mother's honeymoon.

**{¶ 30}** With respect to M.H.'s broken holding arch, the GAL testified that he did not agree with Father's decision not to seek medical attention for M.H., stating that "blaming the child * * * is not helpful." However, the GAL did not fault Father for not seeking medical attention for M.H.'s injured foot.

**{¶ 31}** The GAL concluded his testimony by again stating that he believed Father should be named the residential parent and legal custodian of the children. However, he felt the parenting schedule set forth in the shared parenting plan should remain the same, with the exception that he again recommended overnight visits with Father on Mondays and Wednesdays in the summertime and an 8:00 p.m. return time for the children on Monday and Wednesday evenings during the school year.

**{¶ 32}** At the conclusion of the hearing, the magistrate made arrangements to hold an in camera interview with P.H. and M.H. On December 6, 2016, subsequent to this interview, the magistrate issued a decision terminating the parties' shared parenting plan, naming Father the residential parent and legal custodian of the children, and awarding Mother parenting time as follows:

> [Mother] is awarded parenting time pursuant to the parties'

---

3. Though the parties repeatedly referenced the third GAL report, dated October 12, 2016, and at times quoted from the report at the October 21, 2016 hearing, neither Mother nor Father moved to have the report admitted into evidence. The report was provided to the magistrate and was placed in the trial court's family file.

current parenting time schedule, with the exception of [Father's] return time for the children. During the school year, [Father] shall return the children to [Mother] at 8:00 p.m. on Monday and Wednesday. During the summer months, [Father's] Monday and Wednesday parenting time are overnight parenting time with [Father] returning the children to [Mother] on Tuesday and Thursday at 9:00 a.m. * * * Each party shall have the right of first refusal to provide care for the minor children if the other party finds it necessary to have an alternate care giver for more than an eight (8) hour period of time.

{¶ 33} The magistrate also found CSEA's child support calculation to be inappropriate. Given the termination of the shared parenting plan and Father's designation as residential parent, the magistrate recalculated child support. The magistrate created two child support worksheets, one using Mother as the residential parent and the other using Father as the residential parent, and found that "child support pursuant to the guidelines is inappropriate and unjust for Mother as she has equal parenting time with the parties' child[ren]." The magistrate therefore granted Mother a deviation and determined that the "correct amount of guidelines support when the parties equally share parenting time is the actual DIFFERENCE between the two calculations." Mother was therefore ordered to pay Father $415.12 a month in child support. The magistrate also awarded Father both tax dependency exemptions for the children.

{¶ 34} Mother filed objections and supplemental objections to the magistrate's decision, arguing that naming Father residential parent was not in the children's best interest. Mother contended that she should be named residential parent given the children will live primarily at her home and be in her care and that giving Father the right to decide medical and dental decisions was "potentially harmful to the children." Mother also objected to the magistrate's determination that she pay child support to Father and that Father be awarded both tax dependency exemptions. Mother argued the magistrate's determination of these issues were based on an erroneous finding of fact that the parties had "equal parenting time

with the children" when the children spend substantially more time in her care.

{¶ 35} After holding a hearing on Mother's objections, the trial court overruled the objections and adopted the magistrate's decision in full. The court found that the magistrate's decision "articulated findings of fact and conclusions of law consistent with the testimony and evidence presented" and was "complete and based on sound reasoning."

{¶ 36} Mother timely appealed, raising two assignments of error.

{¶ 37} Assignment of Error No. 1:

{¶ 38} THE TRIAL COURT ERRED TO THE PREJUDICE OF [MOTHER] BY DESIGNATING [FATHER] AS THE RESIDENTIAL PARENT AND LEGAL CUSTODIAN OF THE MINOR CHILDREN OF THE PARTIES.

{¶ 39} In her first assignment of error, Mother argues the trial court erred in determining it was in the children's best interest for Father to be named the residential parent and legal custodian. Mother contends that the trial court, in considering the statutory factors that encompass a best interest determination, made "factual findings and conclusions of law that are unsupported by the record." She further argues that naming Father the residential parent and legal custodian "does not provide a common-sense approach to the situation," as Father has "little or no time to transport the children" to their various appointments and activities.

{¶ 40} The standard of review in custody cases is whether the trial court abused its discretion. *C.D. v. D.L.*, 12th Dist. Fayette No. CA2006-09-037, 2007-Ohio-2559, ¶ 14; *Thompson v. Cannon*, 12th Dist. Fayette No. CA2015-02-003, 2015-Ohio-2893, ¶ 21. An abuse of discretion is more than an error of law or judgment; it implies that the trial court acted unreasonably, arbitrarily, or unconscionably. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). "Upon review, an appellate court may not substitute its judgment for that of the trial court because the 'discretion which a trial court enjoys in custody matters should be

accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned.'" *Cannon* at ¶ 21, quoting *Renner v. Renner*, 12th Dist. Clermont No. CA2014-01-004, 2014-Ohio-2237, ¶ 16.

{¶ 41} As Mother sought to terminate the shared parenting plan jointly filed by the parties, her motion was governed by R.C. 3109.04(E)(2)(c). This provision provides, in relevant part, that "[t]he court may terminate a prior final shared parenting decree that includes a shared parenting plan approved under division (D)(1)(a)(i) of this section upon the request of one or both of the parents or whenever it determines that shared parenting is not in the best interest of the children."[4] Therefore, while a court may terminate the shared parenting plan approved under R.C. 3109.04(D)(1)(a)(i) by finding it is not in the best interest of the child, it is not required to make this finding before it terminates the plan. Instead, the court may terminate such a plan "simply upon the request of one or both of the parents." *Manis v. Manis*, 12th Dist. Warren No. CA2014-05-070, 2014-Ohio-5086, ¶ 14.

{¶ 42} If the trial court terminates a prior shared parenting plan under R.C. 3109.04(E)(2)(c), the court "shall proceed" to allocate parental rights and responsibilities as if no shared parenting plan had ever been granted. *Cannon*, 2015-Ohio-2893, ¶ 19, citing R.C. 3109.04(E)(2)(d). "The court is obligated to designate one parent the residential parent and legal custodian of the child[ren] 'in a manner consistent with the best interest of the children.'" *Id.*, quoting R.C. 3109.04(A)(1).

{¶ 43} To determine the best interest of a child, R.C. 3109.04(F)(1) requires the court to consider all relevant factors. *In re X.B.*, 12th Dist. Butler No. CA2014-07-168, 2015-Ohio-1174, ¶ 19. These factors include, but are not limited to: (1) the wishes of the parents; (2)

---

4. R.C. 3109.04(D)(1)(a)(i) provides that "[i]f both parents jointly make the request in their pleadings [for shared parenting] or jointly file the motion and also jointly file the [shared parenting] plan, the court shall review the parents' plan to determine if it is in the best interest of the children. If the court determines that the plan is in the best interest of the children, the court shall approve it."

the child's wishes, as expressed to the court in chambers; (3) the child's interactions and interrelationships with parents, siblings, and other persons who may significantly affect the child's best interests; (4) the child's adjustment to home, school, and community; (5) the mental and physical health of all persons involved in the situation; (6) the parent more likely to honor and facilitate visitation; (7) whether one parent has denied the other of parenting time; (8) whether child support orders have been followed; and (9) whether either parent has established or is planning to establish a residence outside of Ohio. R.C. 3109.04(F)(1)(a)-(j).

{¶ 44} After a thorough review of the record, we find that the trial court's decision to name Father as the residential parent and legal custodian of the children was not unreasonable, arbitrary, or unconscionable. The record reflects that the trial court considered the factors set forth in R.C. 3109.04(F)(1) in allocating parental rights and responsibilities. The evidence established that the children are loved by both of their parents and are comfortable in both of their parent's care. M.H. and P.H. get along with their new stepfather and like spending time at Mother's home. When at Mother's home, the children enjoy playing with neighborhood friends. At Father's home, there are less neighborhood children for P.H. and M.H. to play with, but they do have two step-sisters and some friends with whom they play. Although Father's residence is more hectic for the children, as there are five teenaged children, Stepmother, Step-grandmother, and Father living in the home, the children are well adjusted and comfortable in the space.

{¶ 45} The court considered the children's adjustment to their school and their parent's involvement in school activities. The children attend the Sycamore school district, where P.H. is doing well in her courses and M.H. is on an I.E.P. to aid in her courses. Although Mother expressed concern that Father was not involved in the children's educational needs, there was testimony presented that Father does homework with the children, has given input into M.H.'s I.E.P. plan, maintains contact with the children's teachers

over the phone to discuss their progress in school, and has set up an account to access the children's school's online portal.

{¶ 46} The court also considered the mental and physical health of the children and parties, as well as Mother's claim that Father interfered with the children's ability to obtain needed orthodontal care. The court discussed Father's belief that the children were overmedicated, and his preference for alternative, non-medicinal methods of treatment for the children's ADHD, OCD, and anxiety.[5] The trial court found that although Father "initially had difficulty in accepting the children's illnesses" and would sometimes seek second opinions, he was "satisfied with the children's current medication and treatment plan[s]." Father indicated he was abiding by the treatment plans and dispensing the children's medications in the manner they were prescribed.

{¶ 47} As for Father's alleged interference with the children's orthodontal care, the court found "[Mother's] testimony * * * not credible." Father recognized that the children needed orthodontal care and his only hesitance in procuring treatment was the cost. The court determined that Father's cancellation of the orthodontic treatment "was not to prevent the children from receiving [said] treatment but * * * simply to provide [Father] with sufficient time to make payment arrangements which he could afford." Although Mother disputes the court's finding that her testimony on this issue was not credible, "the trial judge [was] in the best position to determine the credibility of witnesses because * * * she [was] able to observe

---

5. In her appellate brief, Mother argues that the trial court's findings that (1) P.H. is on medication and sees a therapist every two weeks to treat her OCD and (2) M.H. is on medication to control her excessive eating are unsupported by the record. At the hearing on Mother's motion to terminate shared parenting, Mother testified that P.H. has OCD and receives cognitive behavior therapy from Dr. Nancy Stella. She also testified that "at some point" P.H. was prescribed generic Prozac. The GAL's May 13, 2016 report also indicates that P.H. takes medication for her OCD and that she "sees a therapist, Dr. Nancy, every two weeks." Given the GAL's report and Mother's testimony, we find there was evidence to support the trial court's finding regarding P.H. However, with respect to M.H. being medicated for excessive eating, there was no testimony to this effect presented at the hearing. The GAL does indicate in his May 13, 2016 report that M.H. is on a medication for overeating but he does not indicate the source of this information. Assuming the trial court was incorrect in making this factual finding and that M.H. is not medicated for overeating does not, however, change the court's best interest analysis given the remaining evidence before the court.

their demeanor, gestures and attitude." *Rarden v. Rarden*, 12th Dist. Warren No. CA2013-06-054, 2013-Ohio-4985, ¶ 10.

**{¶ 48}** The court also considered the parent most likely to honor and facilitate parenting time, concluding that "Father would be more likely to honor and facilitate court-approved parenting time rights or visitation rights." In reaching this determination, the court considered Mother's actions as they related to her wedding and honeymoon. While recognizing that the parties both "behaved inappropriately" in communicating with one another about the children's attendance at the wedding, the court noted that Mother's actions "deprived [Father] of parenting time that was originally ordered by the court." Rather than permitting the children to spend the week of her honeymoon with Father, Mother objected to the court's decision and allowed the children to stay with a hired nanny, a family friend, and their maternal grandmother for the week. Although Mother believes that consideration of this "particular situation to support [the] finding that [Mother] would be less likely to honor parenting time * * * [is] unwarranted, outrageous, and an abuse of discretion," we find no error in the court's reliance or consideration of this incident in determining the children's best interest. R.C. 3109.04(F)(1) requires the court to consider *all* relevant factors. *In re X.B.*, 2015-Ohio-1174 at ¶ 19. The trial court was entitled to consider this evidence and determine the relative weight to assign to it in examining the best interest factors. *See, e.g., Ruble v. Ruble*, 12th Dist. Madison No. CA2010-09-019, 2011-Ohio-3350, ¶ 18.

**{¶ 49}** The court was also entitled to consider the fact that Mother did not always keep Father informed about the children's needs. The court had before it testimony that Mother sometimes made appointments for the children without telling Father about the appointments. Mother also testified that she explored the idea of sending M.H. to another school, the Springer School, and toured this facility without discussing the new school with Father.

{¶ 50} Finally, in making its best interest determination, the court considered P.H.'s and M.H.'s wishes, as expressed in an in camera interview. Mother challenges the weight given to the children's wishes and urges this court to review the children's in camera interview to see "whether there is any information that was disclosed to the Magistrate that should have been taken into consideration in determining who should be the residential parent of the children." We have reviewed the transcript of the children's interviews and find that the trial court gave appropriate consideration to the children's wishes. As the court noted, the children's wishes "are but a single factor" for the court to consider in allocating parental rights and responsibilities. *See, e.g., Thornton v. Thornton*, 70 Ohio App.317, 320 (3d Dist.1990) (noting that "[t]he paramount consideration in all events is the child's best interest and therefore the child's election is only one of the elements to be considered"). The court was required to weigh the children's wishes alongside other relevant factors in making its best interest determination.

{¶ 51} Given the evidence presented, we find that the trial court did not abuse its discretion in designating Father the residential parent and legal custodian of the children. Although the trial court's decision to name Father residential parent when the children spend the majority of their time in Mother's care is somewhat unusual, under the facts and circumstances presented in this case, the court's decision was not arbitrary, unreasonable, or unconscionable. The court found Father's concerns that Mother acted unilaterally in making decisions about the children's education and medical issues substantiated and it determined it was in the children's best interest to vest authority in Father to decide these issues without substantially disturbing the living arrangements or day-to-day schedule of the children. We find no error in this decision.

{¶ 52} Mother's first assignment of error is, therefore, overruled.

{¶ 53} Assignment of Error No. 2:

{¶ 54} THE TRIAL COURT ERRED TO THE PREJUDICE OF [MOTHER] IN AWARDING CHILD SUPPORT AND BOTH TAX DEPENDENCY EXEMPTIONS TO [FATHER].

{¶ 55} In her second assignment of error, Mother argues the trial court erred in calculating her child support obligation and awarding Father both tax dependency exceptions as the court relied upon "clearly erroneous findings of fact." Specifically, Mother argues the court erred when it found that the "[p]arties have equal parenting time" as the court's order places the children in Father's physical care during the school year only two evenings a week, on Mondays and Wednesdays from 4:45 p.m. to 8:00 p.m., and every other weekend, starting at 6:00 p.m. on Friday until 6:00 p.m. on Sunday.[6] While Father has additional time with the children during the summer months, as the children stay overnight on Monday and Wednesday evenings, Mother contends that Father's time with the children is not "equal" to the time the children are in her care. Mother argues that the "extended parenting time element of the deviation statute [as set forth in R.C. 3119.23(D)] mandates an order in [her] favor" with respect to child support and the allocation of the tax dependency exceptions.

{¶ 56} "It is well-established that the purpose of the child support system is to protect the children and their best interests." *Brown v. Brown*, 12th Dist. Butler No. CA2014-09-184, 2015-Ohio-1930, ¶ 8, citing *Mannerino v. Mannerino*, 12th Dist. Butler No. CA2010-08-210, 2012-Ohio-1592, ¶ 9. The trial court, therefore, possesses considerable discretion in child support matters, and a trial court's decision involving child support is reviewed under an abuse-of-discretion standard. *Rainey v. Rainey*, 12th Dist. Clermont No. CA2010-10-083,

---

6. Pursuant to the parties' initial agreement regarding parenting time, Father's parenting time was to commence at 4:45 p.m. on the weeknights he had parenting time with the children. However, at trial, Father testified that his parenting time does not start on Mondays and Wednesdays until around 6:00 p.m. due to his current work schedule. According to Father, "I'm driving – usually leaving work between 5:00 and 5:30 and then I pick them up at [Mother's] house at 6:00." For purposes of this appeal, we will consider Father's parenting time as commencing at 4:45 p.m. on Monday and Wednesday nights.

2011-Ohio-4343, ¶ 30. As previously stated, an abuse of discretion is more than an error of law or judgment; it implies that the trial court acted unreasonably, arbitrarily, or unconscionably. *Blakemore*, 5 Ohio St.3d at 219. "A decision is unreasonable if there is no sound reasoning process that would support that decision." *AAAA Enterprises, Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161 (1990).

{¶ 57} Pursuant to R.C. 3119.22, a trial court may deviate from the standard child support order if, after considering the factors and criteria set forth in R.C. 3119.23, such an order would be unjust or inappropriate and would not be in the best interest of the children. *Brown*, 2015-Ohio-1930 at ¶ 7. In determining if a deviation is in the best interest of the children, R.C. 3119.23 sets forth a number of factors that the court may consider. *Id.* These factors include, but are not limited to (1) extended parenting time or extraordinary costs associated with parenting time, (2) disparity in income between parties or households, (3) benefits that either parent receives from remarriage or sharing living expenses with another person, and (4) the relative financial resources, other assets and resources, and needs of each parent. R.C. 3119.23(D), (G), (H), (K), and (P).

{¶ 58} "Although a trial court is permitted to deviate from the standard child support worksheet upon finding that one or more of the factors listed in R.C. 3119.23 are present, a party is not automatically entitled to a downward deviation merely because a factor is present." *Hilbert v. Hilbert*, 12th Dist. Butler Nos. CA2015-10-182 and CA2015-11-185, 2016-Ohio-8099, ¶ 30. Absent an abuse of discretion, a trial court's decision on whether or not to deviate from the child support guidelines will not be reversed. *Id.*

{¶ 59} In the present case, after calculating child support, the court determined in accordance with R.C. 3119.23(D) that "child support pursuant to the guidelines is inappropriate and unjust for Mother as she has *equal parenting time with the parties' child[ren].*" (Emphasis added.) However, the court's allocation of parental rights and

- 21 -

responsibilities does not give the parties "equal parenting time." Rather, the children spend substantially more time in Mother's care, both during the school year and during the summer months.[7] Given that the trial court's finding that the parties have "equal parenting time with the children" is unsupported by the record, we find that the court abused its discretion in calculating child support. In calculating child support and determining the appropriate deviation, the trial court should have considered the substantial amount of extended parenting time Mother has with the children.

{¶ 60} We further find error in the trial court's allocation of the tax dependency exemptions. R.C. 3119.82 governs the designation of which parent is entitled to claim a federal income tax deduction for a dependent child, and provides, in relevant part, as follows:

> Whenever a court issues, or whenever it modifies, reviews, or otherwise reconsiders a court child support order, it shall designate which parent may claim the children who are the subject of the court child support order as dependents for federal income tax purposes as set forth in section 151 of the "Internal Revenue Code of 1986," 100 Stat. 2085, 26 U.S.C. 1, as amended. If the parties agree on which parent should claim the children as dependents, the court shall designate that parent as the parent who may claim the children. *If the parties do not agree, the court, in its order, may permit the parent who is not the residential parent and legal custodian to claim the children as dependents for federal income tax purposes only if the court determines that this furthers the best interest of the children* and, with respect to orders the court modifies, reviews, or reconsiders, the payments for child support are substantially current as ordered by the court for the year in which the children will be claimed as dependents. *In cases in which the parties do not agree which parent may claim the children as dependents, the court shall consider, in making its determination, any net tax savings, the relative financial circumstances and needs of the parents and children, the amount of time the children spend with each parent, the eligibility of either or both parents for the federal earned income tax credit or other state or federal tax credit, and*

---

7. During the school year, over a two-week time period, the children spend only 61 hours, or 18 percent of the time, in Father's care. During the summer months, over a two-week time period, the children spend 113 hours, or 34 percent of the time, in Father's care. The remainder of the time, the children are in Mother's care for the exercise of her parenting time.

*any other relevant factor concerning the best interest of the children.*

(Emphasis added.) This section, therefore, establishes a presumption in favor of awarding the tax exemption to the residential parent. *See Hilbert*, 2016-Ohio-8099 at ¶ 39. However, the court may award the tax exemptions to the non-residential parent where it furthers the best interest of the children. *Zimmerman v. Zimmerman*, 12th Dist. Butler No. CA2014-06-127, 2015-Ohio-1700, ¶ 69. An appellate court reviews a trial court's decision allocating tax exemptions for dependents under an abuse-of-discretion standard. *Id.* at ¶ 68.

{¶ 61} In the present case, the trial court awarded Father both tax dependency exemptions after naming him the residential parent and legal custodian. In doing so, the court stated that "[n]o testimony or evidence was presented on the issue of tax exemptions." However, the record reveals that the parties challenged the administrative adjustment of child support, stipulated their annual salaries, and presented testimony about the amount of time the children spend in each parent's care. Given this evidence, and the provision in R.C. 3119.82 that provides that "[w]henever a court issues, or whenever it modifies, reviews, or otherwise reconsiders a court child support order, it shall designate which parent may claim the children who are the subject of the court child support order as dependents for federal income tax purposes," we find that the parties did raise the issue of the allocation of the tax exemptions and presented evidence relevant to a determination of this issue. Because the trial court failed to consider the evidence as it pertained to the factors set forth in R.C. 3119.82 before allocating the tax exemptions, we conclude that the trial court abused its discretion.

{¶ 62} We therefore sustain Mother's second assignment of error and reverse the trial court's decision awarding Father child support and both tax dependency exemptions. On remand, the trial court is ordered to determine child support and the award of the tax

dependency exemptions in accordance with the requirements of R.C. 3119.22, 3119.23, and 3119.82, taking into consideration the substantial amount of extended parenting time Mother has with the children.

{¶ 63} Judgment affirmed in part, reversed in part, and the matter remanded for further proceedings consistent with this opinion.

PIPER and M. POWELL, JJ., concur.