[Cite as *Garrett v. Kronk*, 2025-Ohio-783.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

MADISON COUNTY

| | | |
|---|---|---|
| ROY GARRETT, | : | |
| Appellee, | : | CASE NO. CA2024-05-010 |
| | : | O P I N I O N |
| - vs - | : | 03/10/2025 |
| | : | |
| ASHLEY KRONK, | : | |
| Appellant. | : | |

APPEAL FROM MADISON COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case No. 20940091

Roy Garrett, pro se.

Rachel B. Caldwell, for appellant.

**M. POWELL, J.**

{¶ 1} Appellant, Ashley Kronk ("Mother"), appeals the decision of the Madison County Court of Common Pleas, Juvenile Division, terminating a shared parenting plan and designating appellee, Roy Garrett ("Father"), the residential parent and legal custodian of their child. For the reasons outlined below, we affirm the juvenile court's

decision.

**{¶ 2}** The parties are the biological parents of N.R.G. ("Natalie"), who was born in January 2009.[1] Mother and Father were never married to each other. Parental rights and responsibilities for Natalie were allocated between the parties pursuant to a shared parenting plan ("SPP"), which was filed with the juvenile court on August 6, 2009. At the time the SPP was originally filed, Mother and Father shared equal parenting time with Natalie. Both parties were identified as the residential parent and legal custodian, and Father was designated the residential parent for school purposes.

**{¶ 3}** Throughout the life of the case, Mother and Father agreed to modify the provisions of the SPP. The most recent modification, filed with the juvenile court in December 2018, provided that Father had parenting time from 6:00 p.m. on Mondays until 6:00 p.m. on Wednesdays; Mother had parenting time from 6:00 p.m. on Wednesdays until 6:00 p.m. on Fridays; and the parties alternated weekend parenting time.

**{¶ 4}** In March 2023, Father moved the trial court to find Mother in contempt of court. In his motion, Father alleged that Mother prevented Father from exercising his parenting time on several occasions between September 2022 and February 2023, and that she was interfering with his communication with Natalie. After a hearing, the juvenile court found Mother in contempt. As a result of Mother's contempt, the juvenile court suspended the existing parenting schedule and awarded Father additional parenting time between May and August 2023. Four of those weeks were to be exercised by Father without interruption from Mother. For the remaining weeks, Mother could exercise parenting time on alternating weekends, while the remaining parenting time was allocated

---

1. Natalie is a fictitious name for N.R.G., which we will use throughout the opinion for readability purposes.

to Father.

{¶ 5} Shortly after the parenting schedule set forth in the SPP resumed, Mother moved the juvenile court for the emergency custody of Natalie. In her motion, Mother claimed that Natalie did not want to go to Father's house for his parenting time and that Natalie was not safe at Father's home. According to Mother, Natalie had expressed that Father had threatened to "'beat the shit out of [Natalie]' with a belt" and screamed at her nonstop. Mother claimed she was in fear for Natalie's safety, and that Natalie had developed anxiety and depression due to "these circumstances." Mother filed an additional motion for custody the same day, in which she requested that she be granted full custody of Natalie.

{¶ 6} The juvenile court denied Mother's motion for emergency custody and the matter proceeded to a final hearing on the remaining custody dispute. At the hearing, the juvenile court heard testimony from Mother, Father, Father's wife ("Stepmother"), and Jeremy Collins, the father of Mother's younger child.

{¶ 7} The testimony presented at the hearing revealed that Mother desires full custody of Natalie and believes that it is in Natalie's best interest to be with Mother full-time. Mother is concerned with Father's parenting of Natalie and testified that the time Natalie spends with Father is negatively impacting her physical and mental health. According to Mother, Natalie has described Father grabbing her, threatening to beat her with a belt, and screaming at her all day long. Natalie has also expressed that she no longer wants to be at Father's home, oftentimes cries before Father's parenting time, and has threatened to kill herself to avoid going to his home. Mother wants to keep Natalie safe and believes less time with Father is the best way to achieve that goal.

{¶ 8} Mother described her relationship with Natalie as great and noted that Natalie does not have the same emotional response to parenting time with Mother as she

does to her parenting time with Father. Natalie has a good relationship with Mother's family and is comfortable and adjusted to Mother's home. Mother testified that Natalie does not share a good relationship with Father or Stepmother and is not adjusted to their home.

{¶ 9} Mother stated that Natalie complains of Father's frequent interrogation regarding the instant court proceedings and his lack of inquiry into her feelings. Although Mother denied involving Natalie in the court proceedings, she told Natalie she is seeking full custody and that "very soon, [Natalie] would get what she want[s]."

{¶ 10} At the time of the hearing, Natalie attended London High School and had As, Bs, and Cs in her classes. Mother testified that Natalie's grades had significantly declined and that she was struggling socially. Mother attributed Natalie's struggles to the problems she is having at Father's. If Mother was deemed the residential parent for school purposes, Mother testified Natalie could change school districts or engage in homeschooling if she desired. According to Mother, Natalie had expressed such a desire due to how "bad and hard" school has become.

{¶ 11} Mother testified that pickups from Father's have become contentious, including one occasion where Mother was a few minutes late and Father "flipped [her] off," and other occasions where Natalie ran out the door crying. Father acknowledged one instance where Natalie left his home crying but claimed the remainder of Mother's testimony in this regard was "all made up."

{¶ 12} Regarding the contempt proceedings, the testimony revealed that Natalie did not spend any time at Father's home from October 2022 until April 2023. Mother testified that, during that time, Natalie did not want to go to Father's because of "the things that he had said. He had backhanded her in the mouth and called her some names." According to Mother, when she and Natalie informed Father that Natalie did not want to

- 4 -

go to his home anymore, Father threatened Natalie, telling her she was "going to juvie," and that her "mom's going to jail."

{¶ 13} After Mother was found in contempt, Natalie returned to Father's for several weeks between May 2023 and August 2023. Initially, Natalie was upset and threatened to kill herself if she had to return to Father's. Natalie was later taken to the hospital by her maternal grandmother, where she recanted her threat of self-harm and informed the doctor she was "just mad" at the time. According to Mother, since the contempt proceedings, she has facilitated a relationship between Father and Natalie.

{¶ 14} In April 2023, Natalie began counseling. At the time of the hearing, Natalie did not have any formal mental health diagnosis from her counselor, though both parties agreed counseling was beneficial for Natalie. The counseling appointments were initially held after school on Tuesdays, during Father's parenting time, but were later moved to during school on Thursdays, during Mother's parenting time. Father adamantly opposed Natalie attending counseling during the school day, and the appointments were eventually changed to Thursday evenings. Mother claimed the counseling appointments were rescheduled because Father complained of taking Natalie to the appointments and that he constantly interrogated Natalie regarding the sessions. Father denied complaining of the appointments and conversely testified that Mother unilaterally changed the appointments to occur during her parenting time in an effort to control the situation and influence Natalie's conversations with her counselor. Father testified that he never missed a counseling appointment while they were during his parenting time and that Natalie was uncomfortable with Mother's behavior at those appointments.

{¶ 15} Mother has significant concerns regarding Natalie's mental health. According to Mother, Natalie's time at Father's has a direct adverse impact on her mental health and Natalie has "completely changed." Mother testified that when Natalie returns

from Father's home "it's nothing but breakdowns" and Natalie refuses to sleep in her own bed or without Mother. Father testified he has minor concerns regarding Natalie's mental health, which stem from the back and forth between him and Mother. According to Father, Natalie's counselor indicated Natalie is doing "phenomenal[ly]," which leads Father to believe Natalie's mental health is "probably okay." Regardless of her progress in counseling, both parties testified that Natalie is under a lot of stress due to the instant proceedings.

{¶ 16} There was significant testimony at the hearing pertaining to Natalie's cell phones and her ability to use those phones while at Mother's home. According to the parties, Natalie has two phones, one purchased by Mother and one purchased by Father. After the contempt proceedings, Natalie was to select one phone to utilize at both homes. Although the parties agreed that Natalie selected Father's phone to use and travel between Mother and Father's, Natalie's phone from Mother's remained active and in use while Natalie was at Mother's home. Neither Father nor Stepmother can contact Natalie on the phone that Mother provides.

{¶ 17} Both parties testified that Father presently does not allow the phone he provides to go to Mother's home. Father explained that he implemented such a rule after learning Mother was using the phone to repeatedly call the father of her younger child. Father presented evidence that, prior to this recent change, his phone for Natalie was not used while she was at Mother's home. Father claimed this was because Mother does not allow open access to the phone Father provides while Natalie is at Mother's home and instead keeps the phone away from Natalie unless Father calls. The lack of contact with Natalie while at Mother's home is frustrating to Father and Stepmother.

{¶ 18} Mother testified that some of the issues between her and Father could be fixed with better communication, and that she was willing to work on their communication

via counseling. Notwithstanding this testimony, Mother later acknowledged that, despite Father's request, she refused to communicate with Father via AppClose. Although Mother believed that speaking through AppClose would facilitate communication between the parties, she was unwilling to utilize the program unless it was court ordered.

{¶ 19} During his testimony, Father stated that he and Natalie have a good relationship and that she is likewise bonded with Stepmother and their six-year-old son. Father testified that he and Natalie are best friends, and described the activities they do together, including going on vacations, spending time at the lake, and riding motorcycles. Father explained that he was happy with the current parenting-time schedule, but if it had to change, he would like Natalie to live with him. Father believes Mother lives in a state of chaos, in which she moves frequently and introduces new people into Natalie's life. Father, on the other hand, has lived in the same house for eight years and has been married to Stepmother for ten years.

{¶ 20} Father testified that he has some flexibility with his work schedule as a business owner but that he works outside the home. Stepmother is a stay-at-home mom, which allows her to transport Natalie to and from school and to pick up Natalie from Mother's house. According to Father, Stepmother and Natalie enjoy this time together and it reduces Father's interactions with Mother, which tend to go poorly. Stepmother similarly testified that she enjoys this time with Natalie, and that Natalie has never complained about Stepmother's involvement.

{¶ 21} Father further testified that he does not believe a change in school districts would be beneficial to Natalie, nor does he agree that Natalie is struggling in school, either academically or socially. According to Father, although Natalie's friend group may have changed after she did not make the volleyball team, Natalie remains social. Father testified Natalie has several friends who spend time at their home and that she went to

the homecoming dance with a group of friends. Stepmother similarly testified that she is not concerned with Natalie's social life. Both Father and Stepmother believe Natalie is doing great in school and, aside from a few missing assignments, Father is not concerned with Natalie's grades. Father attributes any decrease in her academic performance to her transition from grade school to high school.

{¶ 22} Father denied having any physical altercations with Natalie or that he has done anything more than threaten to "whip her butt," which he described as a "father correcting their child." Stepmother likewise testified she has never seen Father use any type of "hands-on or corporal punishment" with Natalie. Father, however, acknowledged that he engaged in a physical altercation with Mother's ex-boyfriend after one of Natalie's basketball games. According to Father, he and Mother's ex-boyfriend were bickering in the parking lot after Natalie's basketball game. The encounter quickly turned physical, and Father struck Mother's ex-boyfriend. As a result of the incident, Father was charged with and pled guilty to disorderly conduct.

{¶ 23} Father testified that he asked Natalie about her alleged desire to live with Mother full time. Father explained he was "blindsided" when he received Mother's motion for emergency custody, as things quickly returned to "normal" after the contempt proceedings and Natalie was happy. Father claimed Natalie denied stating she wanted to live with Mother full-time and that Natalie was upset that she had to return to court for an in-camera interview. Father stated he has tried "absolutely everything" to co-parent with Mother, including forgoing contempt proceedings to avoid hurting Natalie. Notwithstanding his attempts, Father believes Mother will always find a way to make things difficult. He considers Mother to be very controlling and manipulative when it comes to her time with Natalie.

{¶ 24} Stepmother testified that she had been in Natalie's life for approximately 14

years. Stepmother described her relationship with Natalie as "really close" and noted that Natalie comes to her to talk about school, friends, and family. Natalie also confides in Stepmother about the stress she feels from her parents' inability to get along.

{¶ 25} Stepmother further testified that she and Jeremy Collins, Mother's ex-boyfriend and the father of Mother's younger child, have an arrangement where Stepmother babysits Mother's younger child for approximately six hours on Tuesdays. During that time, Natalie can spend time with her younger sister, which is a relationship that is important to all parties. According to Stepmother, Natalie shares a close relationship with her younger siblings, and enjoys spending time with Father's extended family members, including Collins and her younger sister, at family events and parties.

{¶ 26} Collins testified on behalf of Father. During his testimony, Collins stated that he was in a relationship with Mother for several years and had lived with Mother and Natalie when Natalie was approximately 11 or 12 years old. During that time, Mother and Father followed the same parenting time schedule that was in place at the time of trial. Collins testified that Mother is "a very good manipulator," and that the "biggest thing" is Mother's emotional treatment of Natalie. According to Collins, Mother uses Natalie as a weapon or a tool to gain an advantage over him or Father and oftentimes involves Natalie in their disputes.

{¶ 27} Collins testified to the communication challenges he and Father experience while trying to co-parent with Mother. According to Collins, "there is really no . . . positive communication" or "back and forth" with Mother. Instead, "it's either her way, or she won't have any part of it." Collins stated that Mother takes a similar approach to scheduling appointments, in that, "if it's not what [Mother] suggested, like, down to the tee, she's not happy with it, period, end of story." According to Collins, co-parenting with Mother is difficult due to the lack of communication.

{¶ 28} At the close of Mother's case, the juvenile court interviewed Natalie in chambers. The juvenile court interviewed Natalie a second time after Father rested his case. We have reviewed Natalie's in-camera discussions with the juvenile court.

{¶ 29} On March 18, 2024, the juvenile court issued a journal entry finding it was in Natalie's best interest to terminate the SPP, terminate Father's child support obligation, and name Father the legal custodian and residential parent for all purposes, including school placement.[2] In so doing, the juvenile court discussed the applicable R.C. 3109.04(F) factors and found that shared parenting is not in the best interest of Natalie. The juvenile court noted that Mother has continued her controlling behavior and refuses to recognize Father's rights as an equal parent. The juvenile court further noted that there is a significant lack of communication between the parties, largely due to Mother's behavior. The juvenile court specifically found that Mother was evasive in her answers on cross-examination and that her testimony lacked credibility. The court further found the testimony of Father, Stepmother, and Collins to be credible.

{¶ 30} Mother now appeals, raising the following assignment of error for our review:

> THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION IN GRANTING APPELLEE CUSTODY OF THE MINOR CHILD AS THE DECISION IS AGAINST THE WEIGHT OF THE MANIFEST WEIGHT OF THE EVIDENCE AND NOT IN THE BEST INTEREST OF THE MINOR CHILD.

{¶ 31} In her assignment of error, Mother argues the juvenile court's decision finding it was in the child's best interest to designate Father the residential parent and legal custodian was an abuse of discretion in that it was against the manifest weight of

---

2. The juvenile court did not alter the existing parenting time schedule and ordered Father to exercise parenting time from 6:00 p.m. on Mondays until 6:00 p.m. on Wednesdays; Mother to exercise parenting time from 6:00 p.m. on Wednesdays until 6:00 p.m. on Fridays; and that the parties would alternate weekend parenting time.

the evidence. We disagree.

**{¶ 32}** An appellate court reviews a lower court's custody determination for an abuse of discretion. *In re S.K.*, 2014-Ohio-563, ¶ 12 (12th Dist.). An abuse of discretion implies that the court's attitude was unreasonable, arbitrary, or unconscionable. *In re B.K.*, 2011-Ohio-4470, ¶ 12 (12th Dist.), citing *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). The discretion that a lower court enjoys in custody matters "'should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned.'" *In re J.M.*, 2009-Ohio-4824, ¶ 17 (12th Dist.), quoting *Miller v. Miller*, 37 Ohio St.3d 71, 74 (1988). "[A]n appellate court affords deference to a judge or magistrate's findings regarding witnesses' credibility." *In re D.R.*, 2006-Ohio-340, ¶ 12 (12th Dist.).

**{¶ 33}** As noted above, Mother argues the juvenile court's decision designating Father the child's residential parent and legal custodian was against the manifest weight of the evidence. A manifest weight of the evidence challenge concerns "'the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other.'" *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 12, quoting *State v. Thompkins*, 1997-Ohio-52, ¶ 24. "In reviewing the manifest weight of the evidence, this court weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered." *Brown v. Brown*, 2019-Ohio-2164, ¶ 30 (12th Dist.), citing *Eastley* at ¶ 20. "[R]eversing a judgment on manifest weight grounds should only be done in exceptional circumstances, when the evidence weighs heavily against the judgment." *Jones v. Wall*, 2016-Ohio-2780, ¶ 14 (12th Dist.), citing *In re G.S.*, 2006-Ohio-2530, ¶ 4 (10th Dist.).

**{¶ 34}** Pursuant to R.C. 3109.04(E)(2)(d), upon terminating a shared parenting plan, the juvenile court shall issue a modified decree for the allocation of parental rights and responsibilities as if no shared parenting plan had ever been granted and as if no request for shared parenting had ever been made. *Thompson v. Cannon*, 2015-Ohio-2893, ¶ 19 (12th Dist.). The juvenile court must then "designate one parent the residential parent and legal custodian of the child 'in a manner consistent with the best interest of the child.'" *Harmon v. Radcliff*, 2017-Ohio-8682, ¶ 42 (12th Dist.), quoting R.C. 3109.04(A)(1).

**{¶ 35}** To determine the best interest of the child, R.C. 3109.04(F)(1) requires the juvenile court to consider all relevant factors. *In re X.B.*, 2015-Ohio-1174, ¶ 19 (12th Dist.). The best interest factors are set forth in R.C. 3109.04(F)(1)(a) thru (j). These best interest factors include, but are not limited to, the following:

> (1) the wishes of the parents;
>
> (2) the child's wishes, as expressed to the court in chambers;
>
> (3) the child's interactions and interrelationships with parents, siblings, and other persons who may significantly affect the child's best interests;
>
> (4) the child's adjustment to home, school, and community;
>
> (5) the mental and physical health of all persons involved in the situation;
>
> (6) the parent more likely to honor and facilitate visitation;
>
> (7) whether one parent has denied the other of parenting time;
>
> (8) whether child support orders have been followed; and
>
> (9) whether either parent has established or is planning to establish a residence outside of Ohio.

"[N]o single factor is determinative of the best interest of a child; rather, the determination should be made in light of the totality of the circumstances." *Blessing v. Blessing*, 2019-

- 12 -

Ohio-3951, ¶ 16 (12th Dist.).

**{¶ 36}** On appeal, Mother does not challenge the juvenile court's decision to terminate the SPP. Instead, Mother claims that after balancing the factors of R.C. 3109.04(F) and weighing the evidence presented at the hearing, the juvenile court should have awarded custody of Natalie to Mother, not Father. In support of her argument, Mother highlights certain contradictory statements throughout Father's testimony, as well as favorable statements testified to by Mother and her belief that Natalie's wishes weigh in Mother's favor. After our review of the entire record, including Natalie's in-camera interviews, we find no merit to Mother's claims.

**{¶ 37}** Regarding the inconsistencies noted by Mother on appeal, we acknowledge that the witnesses offered conflicting testimony as to various topics, including Natalie's performance at school; Natalie's relationship with Father, including his alleged violent behavior toward her; and Stepmother's involvement in Natalie's day-to-day activities. But, as this court has routinely held, the juvenile court was in the best position to resolve these conflicts in the testimony. *Kelch v. Kelch*, 2004-Ohio-5647, ¶ 17 (12th Dist.). After considering the foregoing conflicting testimony presented at the hearing, the juvenile court specifically found Father and his witnesses to be more credible than Mother. This court will not second-guess the trial court's decision or substitute its judgment for that of the trial court. *Hall v. Hall*, 2019-Ohio-81, ¶ 25 (12th Dist.). This is because the trial court was in the best position to view the witnesses, observe their demeanor, gestures and voice inflections, and to use those observations in weighing the credibility of the witnesses' testimony. *Id.*, citing *McBride v. McBride*, 2012-Ohio-2146, ¶ 11. In determining what weight to assign to the witnesses' testimony, the trial court was free to believe all, part, or none of their testimony. *Id.*

**{¶ 38}** In its decision, the juvenile court made numerous findings related to the best

interest factors. Having thoroughly reviewed the record before us, we conclude that the findings made by the juvenile court were supported by competent and credible evidence. We likewise conclude that there was ample evidence in the record, if believed, to support the juvenile court's decision to terminate shared parenting and name Father Natalie's legal custodian and residential parent. This includes evidence that Mother is unwilling to communicate and cooperate with Father, does not encourage or facilitate a relationship between Natalie and Father, and is overtly controlling and manipulative to the detriment of Natalie. There was also evidence that Mother has a history of involving Natalie in her disputes with Father and other paramours, and has implied ulterior motives for seeking full custody of Natalie.

{¶ 39} Relying heavily on her own testimony as to what she believes would be in the child's best interest, Mother argues the juvenile court erred in its weighing of the relevant best interest factors. In support, Mother claims the juvenile court did not give enough weight to her testimony that she is responsible for most of Natalie's day-to-day care, that Natalie is afraid of Father and wishes to live with Mother, that Natalie's mental health suffers from her time spent with Father, and that Natalie is not bonded with Father or his family members. However, as this court has stated previously, it is the role of the juvenile court, not this court, to determine the relative weight to assign to each factor when determining the child's best interest. *Bonifield v. Bonifield*, 2021-Ohio-95, ¶ 12 (12th Dist.).

{¶ 40} The juvenile court explicitly discussed each relevant factor in its journal entry and clearly gave great weight to Mother's detrimental behavior discussed above. Despite Mother's dissatisfaction with the juvenile court's decision, this court should not, and will not, second-guess the juvenile court's decision in regard to the appropriate weight to be given to any one of those factors. *Mack v. Mack*, 2019-Ohio-2379, ¶ 33 (12th Dist.),

citing *In re A.B.*, 2010-Ohio-2823, ¶ 35 (12th Dist.). This includes the weight given to the wishes of Natalie, which she privately expressed to the judge in chambers. *See, e.g., In re R.L.S.*, 2014-Ohio-3294, ¶ 32 (12th Dist.) ("a child's wishes are not controlling upon the trial court and are only one of among several factors a trial court considers when determining what is in the child's best interest").

{¶ 41} It is clear that Mother believes Natalie would benefit from less time with Father. However, "[w]hile a parent's wishes about the care and control of his or her children must be considered by the court, 'the parent's wishes should not be placed before a child's best interest.'" *Hall*, 2019-Ohio-81 at ¶ 22, quoting *Harrold v. Collier*, 2005-Ohio-5334, ¶ 44. The juvenile court, just as this court on appeal, must act in a way that places Natalie's best interest above all else. In this case, the record properly before this court reflects that Natalie would benefit from a relationship with both Mother and Father, and that the best way to foster such relationships is by designating Father Natalie's legal custodian and residential parent. Therefore, when considering the record before this court, the juvenile court's decision terminating the SPP and designating Father the residential parent and legal custodian of their child is supported by the manifest weight of the evidence and was not an abuse of discretion.

{¶ 42} Accordingly, finding no abuse of discretion in the juvenile court's decision, Mother's assignment of error lacks merit and is overruled.

{¶ 43} Judgment affirmed.


BYRNE, P.J., and PIPER, J., concur.